UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JESSIE FERN**,                                    Civil Case No. 6:12-176-KI

                    Plaintiff,              OPINION AND ORDER

         v.

**CAROLYN W. COLVIN**, **Acting**
**Commissioner of Social Security**
**Administration**,

                    Defendant.

         Katrhyn Tassinari
         Brent Wells
         Harder, Wells, Baron & Manning, P.C.
         474 Willamette, Suite 200
         Eugene, OR 97401

                    Attorneys for Plaintiff

         S. Amanda Marshall
         United States Attorney
         District of Oregon

Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Ave., Suite 600
Portland, OR 97204-2902

David Morado
Regional Chief Counsel, Region X, Seattle
Roberta G. Bowie
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
1301 Young Street, Suite A-702
Dallas, TX 75202

      Attorneys for Defendant

KING, Judge:

Plaintiff Jessie Fern brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner[1] denying Fern's application for  supplemental security income benefits ("SSI").  I

affirm the decision of the Commissioner.

## BACKGROUND

Fern filed an application for SSI on November 3, 2008.  The application was denied

initially and upon reconsideration.  After a timely request for a hearing, Fern, represented by

counsel, appeared and testified before an Administrative Law Judge ("ALJ") on March 19, 2010.

On June 15, 2010, the ALJ issued a decision finding that Fern was not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is
substituted for Michael J. Astrue as the defendant in this suit.

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

December 15, 2011.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months. 42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability. The evaluation is

carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a

medically severe impairment or combination of impairments.  A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work

activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe

impairment or combination of impairments, disability benefits are denied.

        If the impairment is severe, the ALJ proceeds to the third step to determine whether the

impairment is equivalent to one of a number of listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d)

and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is

conclusively presumed to be disabled.  If the impairment is not one that is presumed to be

disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant performed in the past.  If the claimant is able

to perform work she performed in the past, a finding of "not disabled" is made and disability

benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

        If the claimant is unable to perform work performed in the past, the ALJ proceeds to the

fifth and final step to determine if the claimant can perform other work in the national economy

in light of his age, education, and work experience.  The burden shifts to the Commissioner to

show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.

The claimant is entitled to disability benefits only if he is not able to perform other work.  20

C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  Id.

## THE ALJ'S DECISION

The ALJ found Fern had the following severe impairments:  Sturge-Weber syndrome[2] with seizures, bipolar disorder, anxiety disorder with post-traumatic stress disorder ("PTSD") features, panic disorder, ongoing marijuana abuse, and polysubstance abuse in reported remission.  The ALJ also found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  The ALJ concluded Fern could perform medium work with the following limitations:  he could perform routine, repetitive tasks with simple instructions; he should have no exposure to hazards due to seizure activity; he should not have contact with the general public; he should have no more than occasional contact with coworkers and supervisors; and he would not be capable of collaborating with others.  Due to these limitations, Fern could

_____

[2]"[A] rare congenital condition that is characterized by a port-wine stain affecting the facial skin on one side in the area innervated by the first branch of trigeminal nerve and by malformed blood vessels in the brain that may cause progressive mental retardation, epilepsy, and glaucoma in the eye on the affected side[.]"  www.merriam-webster.com/medlinelus/sturge-weber (last visited 3/22/13).

not perform his past work, but someone with his residual functional capacity ("RFC") could

work as an auto detailer or a hand packager.

## FACTS

Fern was 30 years old at the time of the hearing and had earned a GED.  His work history

included construction, landscaping, plywood builder, and a fast foods worker.  He last worked in

2006.

Fern has a history of drug abuse, including heroin, cocaine, methamphetamine, LSD and

marijuana.  He reported using marijuana daily.  He had been variously diagnosed with bipolar

disorder, depression, PTSD, and anxiety, and was medicated at various times with Seroquel,

Trazadone, Lamictal, Abilify, and Klonopin for those impairments.

Dr. Lyle Forehand examined Fern on December 11, 2008, for a one-time

psychopharmacology consult.  Dr. Forehand reported Fern complained of paranoia, but noted

Fern demonstrated no symptoms while in the waiting room or while waiting outside of the office

during a forty-five minute bomb scare surrounded by 100 strangers.  Relying solely on Fern's

description of his symptoms, Dr. Forehand diagnosed PTSD, mood disorder, not otherwise

specified, attention deficit hyperactivity disorder, and persistent hallucinogen-induced

hallucinosis.

Fern, for the first time, sought medical treatment for a seizure witnessed by his daughter

in December 2008.  Tr. 474.  He was medicated and referred to his primary care physician.

To evaluate Fern's disability claim, Dr. Prithvi Shankar examined Fern on February 19,

2009.  He noted "muscle mass on the left side of the upper and lower extremities were markedly

enlarged compared to the right.  However, DTR's brisk and muscle strength was grossly intact

and symmetrical." Tr. 265. Fern's gait was grossly normal, but he had a mild limp. Dr. Shankar deferred to a psychologist for any limitations associated with bipolar disorder, and concluded Fern's seizures appeared to be "more vasovagal, syncope type episodes, as opposed to a real seizure." He thought Fern had no limitations in sitting, standing or walking, and was able to lift and carry 20 pounds frequently and 40 pounds occasionally. He had no limitations in the use of his hands or arms.

A psychiatrist, Dr. Stefan Lampe, also examined Fern to evaluate his disability claim. Fern's main complaint was that he was a "nervous" person. Tr. 266. Dr. Lampe found no evidence of psychosis, suicidal or homicidal ideation, and thought Fern was "on a good regimen of mood stabilizers, antipsychotics and antidepressants. Clinically he appears to be doing relatively well." Tr. 267. Dr. Lampe thought Fern could interact with supervisors and co-workers, and could understand, remember and carry out simple and technical instructions. Dr. Lampe thought Fern would have no trouble withstanding the stress of a workday.

Three days later, on February 23, 2009, Fern's girlfriend brought him to a clinic because he was discussing suicide. He reported he had seen a disability physician who diagnosed him with a degenerative muscle disease and told him he would be wheelchair-bound in two to five years. His nurse practitioner called the police who checked Fern into a mental institution. He was released the next day with prescriptions for Valium, Trazodone, and Cymbalta.

Fern returned to the institution in May 2009 because of suicidal ideation. He reported feeling depressed and agitated for no good reason. He was discharged two days later; after sleeping, he felt significantly better.

He was treated at the emergency room in June and July 2009 for seizures; he had missed recent doses of his seizure medications prior to at least one of the episodes.

In August 2009, plaintiff spent eight days in the hospital after having an allergic reaction to Dilantin.

By September 2, 2009, Fern noted his seizures had stopped; the medication was working.

Fern returned to the ER reporting itching and rash on September 25, 2009. He was hospitalized, medicated, and his rash was improving when he left against medical advice to smoke marijuana and do "some drugs." Tr. 383. Four days later, he returned to the hospital because his rash came back. He also complained of generalized, chronic pain. He was diagnosed with hives and an allergic reaction; he was medicated and discharged.

When he missed recent doses of his seizure medication in November, he had a seizure and hit his head on a dresser.

Dr. Sylvia Emory treated Fern in December 2009. She observed muscle wasting in his right lower leg, calf and thigh with muscle bulk much less on the right than on his left. He said it was from childhood. She noted a slight limp. She diagnosed a seizure disorder with recent seizures. "He needs to make sure he stays on his medications." Tr. 444.

Dr. Robert Choi examined Fern on December 16, 2009 and diagnosed probable Sturge-Weber syndrome. He commented that Fern demonstrated five out of five motor strength throughout and symmetrically, but motor tone was increased on the right as compared to the left. He demonstrated a steady to normal and tandem gait. Dr. Choi gave him prescriptions for Keppra and Lamictal to control Fern's seizures. Fern reported that the medications controlled his seizures really well.

Page 8 - OPINION AND ORDER

Later that month, Fern began serving a sentence at the Lane County Jail for a parole violation.  He had a witnessed seizure at the jail in January of 2010.  In mid-February, Dr. Judy Pinsonneault at the jail noted that once he was prescribed Keppra, Fern had no more seizures.  She commented the right side of Fern's body was not as well-developed as the left, and that he reported pain from the asymmetry.  She noted an antalgic gait with a right-sided limp and abnormal posture.  She also noted less muscle on the right side, but did not perform any strength testing.  She prescribed vicodin for pain, but discontinued it six days later when deputies found Fern trying to hide the pill in his cup.  He was released from jail on February 17, 2010.

The next day, Dr. David Northway, a psychologist, examined Fern for purposes of evaluating his disability claim.  Fern arrived using a walker, which he stated was due to muscular dystrophy.  Dr. Northway commented that Fern was a confusing historian, had pressured speech, and exhibited a "dramatic quality to his presentation."  Tr. 433.  Based on informal testing, Dr. Northway thought Fern "would have trouble in situations where he is required to demonstrate good verbal and/or visual memory skills.  He also might have difficulty maintaining sustained, focused, attention."  Tr. 436.  He opined Fern might not work cooperatively with others very well.  He performed reasonably well on simple math tasks.  Fern appeared to Dr. Northway to be "marginally capable of hygiene, grooming, and self-care."  Tr. 437.

On March 10, 2010, Dr. Choi saw Fern for a follow-up on his seizures.  "Since his last visit here, he has had a few seizures.  He had one about a week ago[.]"  Tr. 645.  Dr. Choi noted a steady gait.  With respect to motor strength, Dr. Choi identified a "mild weakness on the right."

On April 21, 2010, Dr. Choi wrote Fern's counsel that Fern's "diagnosis of Sturge-Weber syndrome is definite."  Tr. 651.  He reported that Fern's seizure frequency, of several per month,

had diminished with medications, but were not completely controlled.  He thought Fern would

have difficulty using his right hand and leg to lift more than 20 pounds, and would have trouble

doing work requiring significant fine motor control.

## DISCUSSION

I.    Medical Evidence

Fern takes issue with the ALJ's treatment of Dr. Choi's opinion, as well as Dr.

Northway's opinion.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician.  More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart,

454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate reasons

supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at

1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066

n.2.

A.    Dr. Choi

The ALJ accepted Dr. Choi's diagnosis of Sturge-Weber syndrome, but declined to

accept Dr. Choi's opinion that Fern would have trouble lifting more than 20 pounds and could

not perform a job requiring fine motor control.  The ALJ commented that Dr. Choi did not support his opinion with any objective evidence, indicating that the doctor relied on Fern's statements, and that Dr. Choi's own chart notes demonstrated Fern had five out of five motor strength throughout that was symmetrical, with steady and tandem gait.

Instead, the ALJ gave significant weight to Dr. Shankar, who examined and interviewed Fern and concluded Fern could lift and carry 20 pounds frequently and 40 pounds occasionally and had no limitations in the use of his arms and hands.  Dr. Shankar's speciality in internal medicine, the ALJ thought, and the consistency of his opinion with the overall record, made him persuasive.

Fern argues the ALJ was required to give clear and convincing reasons to reject Dr. Choi's opinion.  According to Fern, Dr. Choi's specialty as a neurologist makes him more persuasive since the disorder Fern has is a neurological condition.  See 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Additionally, Dr. Choi caught the diagnosis, while Dr. Shankar did not, and Dr. Choi connected the seizures with Fern's disorder.

Contrary to Fern's assertion, the ALJ was only required to give specific and legitimate reasons supported by substantial evidence in the record in order to give more weight to Dr. Shankar's contradictory opinion over Dr. Choi's.  Here, Dr. Choi's opinion conflicted with his own treatment notes, and was not otherwise supported by any objective examination findings. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief,

conclusory, and inadequately supported by clinical findings").  Regardless of the Dr. Choi's correct diagnosis, Dr. Shankar examined Fern and concluded he had a grossly normal gait, with only a mild limp, and that his muscle strength was grossly intact and symmetrical.[3]  Dr. Shankar's opinion was consistent with other reports that Fern moved his upper and lower extremities without trouble, Tr. 17, 407, consistent with Fern's own understanding of his physicians' opinions, Tr. 186 ("muscles on right side never fully developed[;] doctor says no effect on daily activities[.]  I beg to differ."), and consistent with Dr. Choi's treatment notes.  Tr. 646 (motor strength symmetric); 645 ("mild weakness on the right;" steady gait).

Fern also contends Dr. Choi's opinion stands for the proposition that Fern was experiencing several seizures per month, even with medication.  In fact, I read Dr. Choi's letter and treatment notes to indicate that Fern's seizure frequency had diminished, from several per month, with Dr. Choi's medication regime.  Tr. 651; 646 (in December, last seizure was two weeks before); 645 (noted on March 10, three months later, "since his last visit here, he has had a few seizures"); see also Tr. 632 (only one seizure during his almost two-month period of incarceration; controlled with medication).[4]  Dr. Choi was also optimistic that Fern's seizures could be better controlled with further medications.  The ALJ noted a negative seizure workup, only one medically observed and documented seizure, and Fern's admission that his seizures were controlled really well by medication.  To be cautious, the ALJ limited Fern to work presenting no exposure to hazards.

---

[3]Dr. Shankar can hardly be faulted for failing to connect Fern's seizures with a diagnosis of Sturge-Weber disorder when Fern had experienced a single seizure before he met Dr. Shankar.

[4]Reading Dr. Choi's letter as Fern interprets it would mean Dr. Choi's statement is not supported by his own treatment notes.

The ALJ gave specific and legitimate reasons supported by substantial evidence in the record to reject the lifting limitations identified by Dr. Choi. Additionally, the ALJ accounted for occasional seizures by limiting Fern to work without hazards.

      B.     <u>Dr. Northway</u>

Dr. Northway diagnosed Fern with bipolar disorder, anxiety disorder NOS with features of PTSD, and panic disorder, and the ALJ accepted those diagnoses. Fern contends the ALJ did not account for Dr. Northway's full opinion, including his belief that Fern would have difficulty in situations requiring good verbal and/or visual memory skills, and "might have difficulty maintaining sustained, focused, attention." Tr. 436. The ALJ also did not comment on Dr. Northway's opinion that Fern appeared to be only marginally capable of hygiene, grooming and self care.

The ALJ's RFC demonstrates the ALJ considered Dr. Northway's opinion by limiting Fern to work with routine, repetitive tasks and simple instructions, and to restrictions on his contact with the public, supervisors and coworkers. Plaintiff would have the ALJ read Dr. Northway's opinion to mean Fern "would have" difficulty maintaining sustained attention, but Dr. Northway's opinion was more equivocal than that, using the word "might." <u>Compare</u> Pl.'s Reply 4 <u>with</u> Tr. 436. Similarly, Dr. Northway's opinion that Fern appeared to be "marginally capable of hygiene, grooming, and self-care" is ambiguous about whether Fern was limited in caring for himself in a fashion that would affect his ability to work. Notably, Dr. Northway did not offer any opinions on Fern's appearance elsewhere in his report, nor did any other physician. The ALJ did not err in interpreting Dr. Northway's opinion the way he did.

Furthermore, the ALJ relied on state agency medical consultant Dr. K. Loomis, who interpreted Fern's moderate limitations in maintaining concentration, persistence or pace to mean he could maintain concentration, persistence and pace throughout a normal workday to accomplish simple tasks. Tr. 22. Dr. Loomis' opinion was confirmed by state agency medical consultant Dr. E. Wong's review of the record. Id. The ALJ also relied on Dr. Lampe's opinion, who examined Fern and thought he could understand, remember and carry out simple and technical instructions. See Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (the ALJ is responsible for "determining credibility, resolving conflicts in medical testimony, and resolving ambiguities"). Fern does not challenge the ALJ's reliance on these other opinions. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ responsible for making credibility determinations and for translating medical opinions into concrete restrictions).

The ALJ did not err in his assessment of Dr. Northway's opinion.

II.    Lay Witness

The ALJ referenced Christina French's third-party function report. French, Fern's girlfriend, reported Fern sat and lay down all day, he could do the laundry and rake the yard for twenty minutes, but he needed to rest afterward, and he played the guitar about twice a month but experienced tendonitis in both hands (without specifying how long he could play). He went outside about ten times a day. He could follow written instructions "excellent," but had trouble with spoken instructions. Tr. 192. The ALJ "considered this evidence" but found "it does not support any limitations on functional capacity greater than that accounted for above." Tr. 24.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

Fern contends French's report supports additional limitations that the ALJ did not include, such as his short attention span, difficulty with spoken instructions, and difficulty with sustained physical work.

The ALJ accounted for French's observations by limiting Fern to routine, repetitive work with simple instructions.  It is true, however, that the ALJ neglected to account for Fern's physical stamina observed by French and, although he easily could have rejected her report for the same reasons he found Fern not entirely credible, he failed to do so.  Even if French's report were credited, however, I find I can "confidently conclude  that no reasonable ALJ . . . could have reached a different disability determination."  Stout, 454 F.3d at 1056.  The ALJ specifically elicited testimony from the VE about sedentary jobs in the national economy.  Tr. 44 (testimony regarding assembler of optical goods).

The ALJ's error was harmless.

III.    "Other Work" in the National Economy

The vocational expert's opinion about a claimant's residual functional capacity has no value if the assumptions in the hypothetical are not supported by medical evidence in the record. Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).

> The ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel.  Rather, the ALJ is free to accept or reject these restrictions . . . as long as they are supported by substantial evidence.  This is true even where there is conflicting medical

> evidence.  The limitation of evidence in a hypothetical question is objectionable
> only if the assumed facts could not be supported by the record.

Id. at 756-57 (citations and quotations omitted).  As I have indicated above, the ALJ properly

rejected Dr. Choi's lifting limitations.  Similarly, as I concluded above, the ALJ folded Dr.

Northway's opinion about Fern's mental limitations into an RFC that was supported by

substantial evidence in the record.  The ALJ accommodated Fern's minimal seizure activity by

precluding hazards at work.  Any additional functional limitations are not supported by the

record.

Finally, Fern argues the hypothetical did not include the ALJ's own finding that Fern had

"moderate" limitations in concentration, persistence and pace.  He argues the limitation to simple

tasks did not account for his problems with concentration, persistence or pace.

The ALJ's RFC was consistent with Fern's own report that he finished what he started,

Tr. 18, and incorporated the limitations identified by Doctors Lampe, Loomis and Wong.

Because substantial evidence supports the conclusion that Fern could perform routine, repetitive

work with simple instructions, despite any possible concentration problems, the ALJ's

conclusion should be upheld.  See Howard v. Massanari, 255 F.3d 577, 582 (9th Cir. 2001)

(PRTF containing a limitation of often having deficiencies of concentration, persistence or pace

which was interpreted into a functional capacity assessment of being "able to sustain sufficient

concentration and attention to perform at least simple, repetitive, and routine cognitive activity

without severe restriction of function" was adequately captured in a hypothetical for "someone

who is capable of doing simple, repetitive, routine tasks").

**CONCLUSION**

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.


IT IS SO ORDERED.

DATED this _____28th_____ day of March, 2013.


     /s/ Garr M. King
Garr M. King
United States District Judge